UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 791-2 |
| vs. | ) | |
| | ) | Judge John Z. Lee |
| STEVE LEWIS | ) | |

## GOVERNMENT'S MOTION IN LIMINE

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby moves this Court *in limine* for an order barring the introduction of evidence, cross-examination, or argument regarding the victim financial institutions' alleged misconduct, negligence, or lack of reasonable reliance. The Seventh Circuit has held that it is improper to "blame the victim" in fraud cases such as this one where the issue at trial centers upon the defendant's actions and intent, not that of the victims of the offense.

## BACKGROUND

Codefendant Atul Bisaria owned and operated hotels doing business under various names in Nebraska, Michigan, Pennsylvania, Ohio, and Florida. In April 2007, Bisaria purchased a Cincinnati hotel and went to Broadway Bank, where he had been a longtime customer, and obtained a $16 million loan with a $10 million line of credit for construction to finance his purchase and intended renovations of the Cincinnati hotel. Defendant Steve Lewis, who owned an interior design company called Contract Purchasing and Design in Boca Raton, purported to act as the general contractor for the project and submitted a $10 million budget to Bisaria for the

project. The proposed budget included estimated costs for the installation of air conditioning and other aspects of renovation even though Lewis's company only did interior design work.

Over the next eight months, between April 2007 and January 2008, Bisaria and Lewis submitted four funding requests totaling $7,750,000 for construction-related work that was purportedly to be performed on Bisaria's Cincinnati hotel. Each of the funding requests was supported by a deposit invoice or invoice from Lewis's company. Broadway Bank approved each of these funding requests without any apparent inspection or verification. Broadway Bank learned only later that only minimal, if any, improvements and renovations had been made to the Cincinnati hotel.

Broadway Bank wired the money for each of the funding requests directly to Lewis's company. However, instead of using all of the money to pay for the labor or materials as reflected in the invoices, Lewis's company wired all or most of the money in connection with each funding request back to Bisaria. Bisaria then used that money to pay for various expenses, including expenses related to the other hotels that he owned in other cities.

The following year, Bisaria obtained a separate loan to refinance an existing mortgage and fund renovations at a hotel he owned and operated in Boca Raton. In February 2008, Mutual Bank provided Bisaria with a $28.88 million loan that included a $9 million construction line of credit for renovations at the Boca Raton hotel. In connection with the loan, Bisaria represented to the bank that, among other renovations, he planned to add an eight floor tower to the hotel that would contain about one hundred new rooms. Once again, Lewis provided a proposed budget to Bisaria in connection with the loan. Shortly after closing the loan, Bisaria and Lewis caused the submission of a funding request for $1,995,000 in connection with the purported purchase of

"structural steel" for the proposed eight story tower being built at the Boca Raton hotel. Mutual Bank, like Broadway Bank, approved the funding request without any inspection of the property.

After approval of the funding request, Mutual Bank wired funds to an escrow company in Florida which, along with additional funds supplied by codefendant Bisaria, wired the funds to Lewis's company. Once again, Lewis caused his company to wire most of the money, namely $1,095,000 out of the $1,950,000 funding request, back to Bisaria instead of using the funds to purchase steel. Bisaria then used most of the money to pay for, among other things, various expenses at his other hotels. Bisaria was, in essence, operating a hotel Ponzi scheme, using money designated for his Cincinnati and Boca Raton hotels to fund projects and debts for his other hotels.

### ARGUMENT

The government moves *in limine* to bar the introduction of evidence or cross-examination on allegations of negligence or unrelated misconduct by employees of Broadway Bank and Mutual Bank. In the course of discovery, in response to requests by defendant's attorney, the government has produced information and materials to the defendant that likely exceeds its discovery obligations. Among the materials produced by the government are those pertaining to purported bad acts, wrongs, or negligence that may have been committed by employees of the victim banks before, after, or during the eleven-month scheme period charged in the indictment, namely, from in or about April 2007 to in or about March 2008. By way of example only, at defendant's request, the government provided defendant with reports of material loss reports prepared by the FDIC's Office of the Inspector General following the failure of both banks. The report for Mutual Bank concluded that the failure of the bank was due to, among other things, a failure by the Board of the bank to provide effective oversight in managing the risks associated

with the bank's aggressive growth strategy. Material Loss Review of Mutual Bank, pp. 2-3 (February 2010) (attached as *Exhibit A*). Similarly, the government produced various reports detailing possible acts of misconduct by employees of Mutual Bank, including allegations of self-dealing in connection with the issuance of other loans.

The matters addressed in these materials do not bear directly – or perhaps even indirectly – on defendant's charged transactions or false funding requests to Broadway Bank and Mutual Bank. To the contrary, this evidence largely involves other unrelated transactions, involving unrelated borrowers and bank clients, during unrelated time periods, handled by bank personnel who had no direct dealings with defendant and with whom defendant, himself, also did not directly deal.

The government anticipates that defendant will attack former employees of Broadway Bank and Mutual Bank and attempt to lay blame on the victim banks for approving the construction loans and not exercising more diligence in ensuring that the funds requested and obtained by both defendants were being properly used in renovating the Cincinnati and Boca Raton hotels. The government also anticipates that defendant will attempt to introduce extraneous allegations of fraud or misconduct at each of the banks in connection with other transactions. The government submits that such evidence is inadmissible under Federal Rules of Evidence 401, 402, 403, and 404(b).

### A.     Any Negligence or Misconduct by Bank Employee is not Relevant.

The mail and wire fraud statutes punish the existence of a scheme to defraud and do not require the government to prove that a victim was actually defrauded as a result of the scheme. The relevant evidence is therefore the evidence that focuses on the defendant's knowledge and intent, as opposed to the knowledge and intent of the victim. *See United States v. Biesiadecki*,

933 F.2d 539, 544 (7th Cir. 1991) (affirming conviction because the "[t]he excluded testimony. . . would have improperly shifted the jury's attention away from the knowledge and intent of [the defendant] and focused instead on the beliefs of the victims of the alleged scheme to defraud"). The federal fraud statutes do not put victims on trial because "[t]hose who are gullible, as well as those who are skeptical, are entitled to the protection of the mail statute." *Id.* (citing *United States v. Sylvanus*, 192 F.2d 96, 105 (7th Cir. 1951); *see also United States v. Amico*, 486 F.3d 764, 780 (2nd Cir. 2007) (holding that a reasonable victim defense does not apply to mail fraud allegations).

Evidence related to the victim is irrelevant even where the victim is negligent, non-businesslike, or engaged in unrelated misconduct. *See United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007); *see also United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (victim's criminal background is not relevant to whether the defendant was properly convicted); *United States v. Allen*, 201 F.3d 163, 167 (2nd Cir. 2000) (even if a victim were negligent, the "victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offense").

In *Serfling*, the Seventh Circuit affirmed the district court's exclusion of evidence that sought to blame the victim at trial under similar circumstances. There, the defendant provided a lending institution, among other things, false bank statements and insurance information in order to obtain a $200,000 loan. The district court excluded evidence, offered by the defendant, that the victim purportedly was negligent in the transaction because a reasonable investigation would have discovered the fraud. The Seventh Circuit, citing *United States v. Coffman*, 94 F.3d 333, 334 (7th Cir. 1996), reaffirmed this Circuit's precedent that "the perpetrator of a fraud may not defend himself by blaming the victim for being duped." *Serfling*, 504 F.3d at 679. Accordingly,

- 5 -

the Seventh Circuit held that the evidence was inadmissible. *See also Coffman*, 94 F.3d at 333

(excluding evidence blaming the victim because "it is not a defense that the intended victim was

too smart to be taken in"); *United States v. Catalfo*, 64 F.3d 1070, 1078 (7th Cir. 1995) ("Fraud

remains fraud even if the victim should have acted more prudently."); *United States v.

Letourneau*, 2013 WL 3834410, *3 (N.D. Ill. July 24, 2013) ("The Seventh Circuit has held

repeatedly that 'the perpetrator of a fraud may not defend himself by blaming the victim . . .'

Accordingly, the Court finds any evidence or argument relating to [the] lender's negligence

inappropriate and grants the Government's Motion.").

Similarly, any argument that evidence of alleged misconduct at each of the banks or other

questionable transactions is relevant to the issue of materially for the wire fraud counts would be

unfounded. The government does not need to show that a lender actually relied on the false

statements made by defendant in order to prove their materiality.[1] "Reliance is not an aspect of

the materiality element in mail-fraud prosecutions." *United States v. Rosby*, 454 F.3d 670, 674

(7th Cir. 2006). A statement is material if it is capable of influencing a decision maker's

decision regardless of whether it actually influences the decision. *United States v. Roberts*, 534

F.3d 560, 570-71 (7th Cir. 2008); *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999).

As the Seventh Circuit stated in *Phillips*, in addressing the elements of a Section 1014

charge, "if you make a knowingly false statement intending to influence a bank, it's no defense

that you didn't succeed in influencing it or even that you couldn't have succeeded." *Phillips*,

731 F.3d at 652. In fact, in addressing materiality in *United States v. Rogan*, 517 F.3d 449, 452

(7th Cir. 2008), a civil False Claims Act case where the defendant sought to overturn a roughly

$64 million judgment by arguing that "a federal employee in a position to take a decision had to

---

[1] Materiality is not an element of the charges under 18 U.S.C. 1014 (Counts Six through Ten). *United States v. Phillips*, 731 F.3d 649, 652 (7th Cir. 2013).

testify that the government was sure to enforce the statute [*i.e.*, the Stark Amendment]," the Seventh Circuit stated:   The "laws against fraud protect the gullible and the careless – perhaps especially the gullible and the careless – and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests.  The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth."   *Id.* (internal citation omitted).

The focus of the mail fraud statute is on the violator and the purpose of the materiality element is to ensure that the defendant actually intended to defraud the victim, not whether the victim was actually defrauded. *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009). As in *Serfling*, defendant should not be permitted to argue or introduce evidence or cross-examine witnesses about the victim's alleged misconduct, negligence, or lack of reasonable reliance on his false representations. The only relevant consideration is whether defendant intended to defraud these financial institutions for purposes of the wire fraud statute.  The misdeeds or malfeasance of the banks' employees are simply not relevant.   No such conduct excuses or provides a basis to knowingly submit false sales order and invoices in connection with funding requests.  Any such evidence is irrelevant under Federal Rules of Evidence 401 and 402.

**B.**     **Rule 403 and 404(b) Prohibits the Introduction of Other Bad Acts for Purposes of Showing Propensity.**

The introduction of evidence related to other alleged bad acts or misdeeds by bank employees that do not relate to the charged transactions or false submissions to Broadway Bank and Mutual Bank would also run afoul of Rule 404(b), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on

a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b)(1).

Furthermore, even when such evidence falls within the limited exception set forth in Rule

404(b)(2),[2] the evidence is still subject to foundational evidentiary principles, namely, that the

evidence must be relevant, must not constitute inadmissible hearsay, and must survive the

balancing of competing considerations under Rule 403. *United States v. Alayeto*, 628 F.3d 917,

921 (7th Cir. 2010); *United States v. Della Rose*, 403 F.3d 891, 902 (7th Cir. 2005); *United*

*States v. Wilson*, 307 F.3d 596, 601 (7th Cir. 2002); *United States v. Walton*, 217 F.3d 443, 449-

50 (7th Cir. 2000); *see also United States v. Johnson*, 729 F.3d 710, 716 (7th Cir. 2013) ("When

a defendant seeks to admit this 'nondefendant' or 'reverse' 404(b) evidence, 'a district court

should balance the evidence's probative value under Rule 401 against considerations such as

prejudice, undue waste of time[,] and confusion of the issues under Rule 403.") (brackets in

*Johnson*) (internal citation omitted).

In *Alayeto*, the Seventh Circuit upheld the district court's exclusion of reverse 404(b)

evidence. There, the defendant and a codefendant were charged with possession with intent to

distribute a controlled substance after police witnessed the defendant take cocaine from her

codefendant and place it in her pants during a traffic stop. At trial, the defendant sought to

introduce evidence related to three other occasions during which individuals concealed

contraband for the codefendant for the purpose of establishing that the defendant lacked the

requisite intent to distribute a controlled substance. *Alayeto*, 628 F.3d at 919-20. In upholding

---

[2] Rule 404(b) is typically used by prosecutors to introduce evidence of a criminal defendant's conduct that is not part of the charged crime, but which is probative of the defendant's motive, intent, or identity with regard to the charged crime. *United States v. Reed*, 259 F.3d 631, 637 (7th Cir. 2001). However, such evidence may also be admitted by the defense "if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him." *Id.* quoting *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999). Such evidence is often referred to as "reverse 404(b)."

the district court's exclusion of the evidence, the court agreed that the codefendant's participation in other drug transactions did not demonstrate that the defendant was forced to take drugs from the codefendant or otherwise negated the defendant's intent. *Id.* at 921-22. The court further noted the district court properly found that the negligible probative value of the evidence was outweighed by considerations of "delay, waste of time, and confusion of the issues before the jury." *Id.* at 922.

The Seventh Circuit continues to rely approvingly on *Alayeto* and its forebears, as confirmed by the court's recent decision in *Johnson*, which affirmed the district court's finding that a particular mortgage broker's "pattern and practice of preparing fraudulent loan applications that defrauded *both* lenders and borrowers was *not* the issue in [that] trial," *Johnson* 729 F.3d at 717 (emphasis added), and, therefore, was properly excluded under Rule 404(b). This was so notwithstanding the fact that the mortgage broker in question was the *same* mortgage broker who *actually brokered* the transaction with which the defendants were charged. *Id.* at 712-13, 716-17. According to the Seventh Circuit, the "district court acted within its discretion when it determined that allowing extrinsic evidence to prove [the mortgage broker's] prior bad acts would distract jurors from the issue at hand – whether [the defendants, a boyfriend-girlfriend couple, who "planned to live in the home with their children"] knew that the documents they initialed and signed contained false statements." *Id*. at 712 and 717. The court made it unmistakably clear when it observed that the couple's "knowledge – not [the mortgage broker's] history – was what the jury needed to determine." *Id.* at 717. The court upheld the district court's exclusion of reverse 404(b) evidence even while acknowledging that in "most cases 'the only serious objection to 404(b) evidence is that its probative value is slight, as it may just amount to pointing a finger at someone else who, having a criminal record, might have

committed the crime the defendant is accused of committing." *Id.* at 716 (brackets in *Johnson*) (quoting *United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007)).  As in *Alayeto* and *Johnson*, the introduction of evidence related to possible misconduct in connection with other loan transaction will only confuse and mislead the jury and distract it from the real issue at trial, whether defendant and his codefendant engaged in wire fraud by submitting false funding requests in connection with the previously obtained loans from Broadway Bank and Mutual Bank.

To be sure, information known to defendant at the time of the charged scheme regarding the banks' lending practices or alleged misconduct may be relevant to whether defendant *believed* a particular misstatement would actually influence the bank.  *See Phillips*, 731 F.3d at 653 (information provided by broker regarding bank's consideration of certain information on mortgage loan application was pertinent to determine whether the defendants had knowingly made a false statement and whether, if so, their intention had been to influence the bank). However, such evidence is only relevant to the extent it was actually *known* to defendant at the time of the charged scheme and should only be admitted for the purpose of establishing his state of mind, not the truth of the matter asserted.  Defendant should not be allowed to introduce extrinsic evidence related to purported misconduct or negligent practices that were unknown to him at the time of the offense and should not be allowed to independently prove up such misconduct or practices.  The evidence should be limited to what defendant knew and how he came to know it.  The defendant, and not the financial institutions he victimized, is the only person on trial.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court grant its motion and bar defendant from introducing evidence or argument of the victims' alleged misconduct, negligence, or lack of reasonable reliance.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:     /s/ Rick D. Young
Rick D. Young
Andrew S. Boutros
Assistant United States Attorneys
219 South Dearborn, 5th Floor
Chicago, IL 60604
(312) 353-5300